UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2006 APR 27 PM 4:44
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | |
|---|---|
| CAROLE KEETON STRAYHORN, § <br> KIMBLE D. ROSS, DAVID MAYES § <br> MIDDLETON II, AND BARBARA § <br> RUUD, § <br>     Plaintiffs § <br> § <br> V. § <br> § <br> ROGER WILLIAMS, TEXAS § <br> SECRETARY OF STATE, § <br>     Defendant § | CASE NO. A-06-CA-205 LY |

# PLAINTIFFS' BRIEF

RAY, WOOD & BONILLA, L.L.P.
Randall B. Wood
State Bar No. 21905000
Doug W. Ray
State Bar No. 16599200
2700 Bee Caves Road #200
Austin, Texas 78746
(512) 328-8877 (Telephone)
(512) 328-1156 (Telecopier)

MINTON, BURTON, FOSTER
 & COLLINS, P.C.
Roy Q. Minton
State Bar No. 14186000
1100 Guadalupe Street
Austin, Texas 78701
(512) 476-4873 (Telephone)
(512) 479-8315 (Telecopier)

**ATTORNEYS FOR PLAINTIFF
CAROLE KEETON STRAYHORN**

# IDENTITY OF PARTIES AND COUNSEL

**Plaintiffs:**  Carole Keeton Strayhorn, Kimble D. Ross, David Mayes Middleton II and Barbara Ruud

**Defendant:**  Roger Williams, Texas Secretary of State

**Attorneys for Plaintiffs:**  Randall B. Wood
Doug W. Ray
Ray, Wood & Bonilla, L.L.P.
2700 Bee Caves Road #200
Austin, Texas 78746
(512) 328-8877 - Telephone
(512) 328-1156 - Telecopier

**Attorneys for Defendant:**  Edward D. Burbach
Richard E. Salisbury
Deputy Attorney General for Litigation
Attorney General of Texas
P.O. Box 12548, Capitol Station
209 West 14th Street, 8th Floor
Austin, Texas 78711-2548
(512) 936-1886 - Telephone
(512) 936-0545 - Telecopier

# TABLE OF CONTENTS

Identity of Parties & Counsel ........................................................... i

Index of Authorities .......................................................................... iii

Background ....................................................................................... 1

Discussion ......................................................................................... 5

    A. Framework for Reviewing Federal
       Constitutional Claims .............................................................. 5

    B. Burden on Plaintiffs' First and Fourteenth
       Amendment Rights ................................................................. 7

    C. The Secretary's Interests do not Justify the
       Burden on Plaintiffs' Rights ................................................... 11

Conclusion ........................................................................................ 12

Certificate of Service ........................................................................ 13

# INDEX OF AUTHORITIES

*Cases*                                                                                          *Page*

*Anderson v. Celebrezze*
    460 U.S. 780 (1983) ...................................................................... 6,7

*Baer v. Meyer*
    728 F.2d 471 (10th Cir. 1984) ........................................................ 7,9

*Buckley v. Valeo*
    424 U.S. 1 (1976) ........................................................................... 6

*Burdick v. Takashi*
    504 U.S. 428 (1992) ...................................................................... 6

*In re Carter-Mondale Reelection Committee, Inc.*
    642 F.2d 538 (D.C. Cir. 1980) ....................................................... 9

*Dart v. Brown*
    717 F.2d 1491 (5th Cir. 1983) ........................................................ 8

*Cf. The Green Party v. Weiner*
    No. 00 CIV. 6639, 2000 WL 1280913, at *3
    (S.D.N.Y. Sep. 8, 2000) ................................................................ 10

*Rosen v. Brown*
    970 F.2d 169 (6th Cir. 1992) .......................................................... 8,11

*Storer v. Brown*
    415 U.S. 724 (1974) ...................................................................... 7

*Timmons v. Twin Cities Area New Party*
    520 U.S. 351 (1997) ...................................................................... 6,7


*Statutes*                                                                                       *Page*

Tex. Elec. Code § 41.007(b) ................................................................ 1

Tex. Elec. Code § 141.065(b) .............................................................. 12

Tex. Elec. Code § 141.069 .................................................................. 3

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| CAROLE KEETON STRAYHORN, § <br> KIMBLE D. ROSS, DAVID MAYES § <br> MIDDLETON II, AND BARBARA § <br> RUUD, § <br>     Plaintiffs § <br> § <br> V. § <br> § <br> ROGER WILLIAMS, TEXAS § <br> SECRETARY OF STATE, § <br>     Defendant § | CASE NO. A-06-CA-205 LY |

# PLAINTIFFS' BRIEF

Plaintiffs, Carole Keeton Strayhorn, Kimble D. Ross, David Mayes Middleton II, and Barbara Ruud, hereby file their Brief in this cause.

## BACKGROUND

Carole Keeton Strayhorn timely filed her notice of intent to run as an independent candidate for Texas Governor on January 2, 2006. (McClung Depo., Ex. 6). Strayhorn is currently collecting signatures to reach the required amount of 45,540 to file with the Texas Secretary of State in order to qualify for the general election ballot. (Nickless Depo. at 39-40; Sanders Depo. at 55). Her application and petitions are due on or before May 11, 2006. *See* TEX. ELEC. CODE §§ 142.005, .006, .009(1); 41.007(b). Because of the Secretary's policy prohibiting the supplementation of applications (Nickless Depo., Ex. 2, pp. 45, 70), and the large number of signatures required, there is a built in incentive to delay filing the application and petitions for as long as possible to amass as

1

many signatures as possible. This disincentive to file early has now been compounded by the Secretary's decision to use a manual count as the exclusive means of reviewing the validity of Strayhorn's petition signatures, which will cause harm to Plaintiffs by impeding Strayhorn's campaign for governor.

According to the experiences of a long-time political consultant, a candidate in a statewide race in Texas needs to start buying television media in May to be competitive, (McClung Depo. at 13-14), and stations will not sell to a candidate that does not have some indication that she has qualified for the ballot. (Id. at 15-16). Additionally, his experience has been that people will use any excuse to delay contributing to a campaign and not being yet qualified for the ballot would be one of those excuses. (Id. at 17). In short, it was this veteran consultant's experience that having to wait until July to start a campaign would put any statewide candidate at an extreme disadvantage. (Id. at 19-20).

These professional experiences comport precisely with one of the plaintiff's observations as a volunteer in many campaigns, that a late start significantly disadvantages a campaign. (Ross Depo. at 42-43). Additionally, this plaintiff found that he has been frustrated in his individual efforts to raise money for the Strayhorn campaign because there is not yet any indication that she will actually be on the ballot. (Id. at 99). According to a Strayhorn campaign consultant, that will be the case until potential donors have some firm signal that she will be on the ballot.

In the campaign's attempt to fundraise, he has found that potential donors who have indicated a willingness to contribute nevertheless are holding off until they are satisfied that she will actually be on the ballot. (Sanders Depo. at 68-72). Moreover, the

2

campaign can not block off major television media until Strayhorn becomes a qualified candidate and the longer that process takes the more it puts her at a special disadvantage versus the major party candidates for governor. (Id. at 72-74). Finally, so long as there is no official indication that Strayhorn has submitted enough valid signatures to be on the ballot, she is at a disadvantage with respect to free media, ie. newspaper and television coverage of her candidacy, because the focus is not on her message as much as it is on whether she will even be a candidate. (Id. at 67-68). All of these burdens and disadvantages to the Strayhorn's candidacy result from the delay in reviewing her petitions.

Until this year, the Secretary's methods for reviewing petitions have remained unchanged for the past fourteen years. Prior to 1992, the Secretary relied on the affidavit of the circulator collecting petition signatures to ensure each signature's validity, (Nickless Depo. at 9, 37), as allowed by section 141.065(b) of the Texas Election Code. Since the Secretary started independently verifying petitions containing more than 1,000 signatures, they have always used statistical sampling (Id. at 37), as allowed by section 141.069 of the Texas Election Code. For the first time in history, the Secretary has decided to check each and every signature on petitions containing more than 1,000 signatures, and the employees in charge of this new process have no idea how long it might take. (Id. at 97-98). However, the available evidence shows that it will certainly take less time to perform a statistical sample than to look at each and every signature.

When expediting a statistical review, the Secretary has in the past been able to complete the verification and notification process in as little as three weeks. (Id. at 22,

25). While in the past it has sometimes taken several weeks to months for the Secretary to verify petitions by sampling, those timelines are not really useful anymore. According to the director of administration within the elections division, "the way [they] plan on doing it in 2006 is comparing apples to oranges as the way [they] did it in the past as far as the way [they're] checking them, the method of validation." (Id. at 97). The director of the elections division has stated that they could run a statistical sample in addition to the total review, and further that they could verify the sample themselves with data maintained by the Secretary, without having to send signatures out to the counties. (McGeehan Depo. at 40-41). Under these circumstances, following the procedures used in the past for verifying samples, except for having to depend upon the counties, would result in an extremely expedited review.

Upon receiving a petition, the Secretary will perform an initial review where they count the number of pages and facially valid signatures, as well as copy the petitions. (Nickless Depo. at 51-53, 54). If they were doing a statistical sample, they would then give these numbers to their statistician, who would select a sample size. (Id., Ex. 2, p. 67). This calculation can be performed in fifteen or twenty minutes. (Olson Depo. at 11). Following the selection of the sample size, they would then create a sufficient quantity of random numbers in order to pull a sample of the correct size. (Nickless Depo., Ex. 2, p. 67). This process can be done in an afternoon, (Olson Depo. at 11), and the director of administration has requested as much in the past. (Nickless Depo., Ex. 2, p. 118). Once the random numbers are generated, then the chosen signatures will have to be pulled and verified. (Id., Ex. 2, p. 67). With two exceptions,

4

every sample size verified by the Secretary has been less than 550. (Id., Ex. 2, pp. 30-32, 62-64, 79-81, 83-85, 90-95, 97-99, 101-03, 105-08, 154-56). Although the Secretary does not know how long it would take them to verify 550 or fewer petition signatures, if done by the same methodology the Secretary will use to verify all petition signatures, by definition it must take enormously less time.

After the verification is complete, the statistician will receive the results in order to produce a report. (Id., Ex. 2, p. 67). This involves having the results "plugged into a formula to determine the validity of the entire petition based on the sample." (Id., Ex. 2, p. 72). In most cases, the process of calculating the results of the formula and writing the report has only taken a few days. For example, in 2000 the statistician received the results for the Green Party on July 28th and produced the report on July 31st. (Id. Ex. 2, pp. 83, 139). She then received the results for the Natural Law Party on August 4th and produced the report on August 7th. (Id. Ex. 2, pp. 79, 139). In 2004 the statistician received the final results for Ralph Nader on July 1st and produced the report on July 5th. (Id. Ex. 2, pp. 30, 149). In at least one case the time frame to receive a report was several weeks, but that was not due to any issues with actually running the numbers or writing the report. With respect to Pat Buchanan's petitions in 2000, the statistician received the final results on June 9th and did not produce a report until July 2nd, (Id. Ex. 2, pp. 62, 112), however, that could very well have been attributable to the fact that the statistician was sometimes out of town, thus causing the delay. (Id. at 95).

## DISCUSSION

A.  *Framework for Reviewing Federal Constitutional Claims*

The ability to associate for political purposes lies at the very heart of those rights protected by the First and Fourteenth Amendments to the federal constitution. *Buckley v. Valeo*, 424 U.S. 1, 15 (1976). When a State's electoral law places a unique burden on independent candidates, it "discriminates against those candidates and-of particular importance-against those voters whose political preferences lie outside the existing political parties." *Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983). Accordingly, a "burden that falls unequally . . . on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment," because the "primary values protected by the First Amendment . . . are served when election campaigns are not monopolized by the existing political parties." *Id.* at 793-94.

As the ultimate expression of this right to political association, "'[v]oting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takashi*, 504 U.S. 428, 433 (1992) (citation omitted). However, the right to associate and vote for independent candidates is not absolute, but is subject to regulation by the State. *Id.* If the State has imposed "severe burdens on [associational] rights," then to be constitutional they "must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). If the State imposes less severe burdens, however, they may be upheld if the State can demonstrate "'"important regulatory interests"'" that are "'sufficiently weighty to justify the limitation.'" *Id.* at 358-59 (citations omitted). In either case, the Court must "weigh the '"character and magnitude"' of the burden the State's rule imposes on [Plaintiffs'] rights against the interests the State contends justify that burden, and consider the extent to

which the State's concerns make the burden necessary." *Id.* at 358 (citations omitted). Moreover, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." *Id.* at 359. Because the "'rule is not self-executing,'" there "'is no substitute for the hard judgments that must be made.'" *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

    B.    *Burden on Plaintiffs' First and Fourteenth Amendment Rights*

Most cases alleging unconstitutional burdens on independent or minority candidates and their supporters involve restrictions that make it more difficult to get on the ballot. However, other types of restrictions can also burden the First Amendment rights of non-major party candidates, even if they do not keep the candidate off the ballot. The proper "inquiry is whether the challenged restriction unfairly or unnecessarily burdens 'the availability of political opportunity,'" *Celebrezze*, 460 U.S. at 793, and such burdens may be unconstitutional even though they do not prevent a candidate from appearing on the ballot.

For example, in *Baer v. Meyer*, 728 F.2d 471, 475-76 (10th Cir. 1984), two minor political parties brought suit alleging that the inability of their members to designate party affiliation on voter registration forms impermissibly burdened their First Amendment rights. Under Colorado law, only those persons associated with the two major parties could note such affiliation, thus providing only those parties with ability to cull the voter registration lists for their supporters. *Id.* at 475. This gave the major parties a very important tool unavailable to the minor parties because, as noted by the court, "under today's political realities, access to minimal information about political

party affiliation is the key to successful political organization and campaigning." *Id.* This disparate treatment between the parties, and by extension their supporters, thus created a burden on the political opportunities of the minor parties by hindering the effectiveness of their campaigning for office.

The Fifth Circuit has likewise recognized that the First Amendment protects a citizen's right "to cast a *meaningful* vote" and to "*meaningfully* associate for the enhancement of political beliefs." *Dart v. Brown*, 717 F.2d 1491, 1505 (5th Cir. 1983). The court noted in *Dart* that if the lack of party affiliation next to the candidate's name on the ballot "diminishe[d] the [candidate]'s chances of success in any given election," then such a restriction could arguably impose an impermissible burden on the right to meaningfully cast a vote and meaningfully associate. *Id.* at 1504-05. Although the Fifth Circuit found no evidence in the record to support such a claim in its case, other courts have held that where the lack of party designation on the ballot has been shown to adversely affect an independent candidate's chances for electoral success, such laws violate the First and Fourteenth Amendments. *See Rosen v. Brown*, 970 F.2d 169 (6th Cir. 1992) (holding that supplying party identification on ballot for major party candidates but not for independent candidates impermissibly burdened rights of independent candidates and their supporters, and that state had no interest sufficient to justify this burden).

As shown by the record in this case, the Secretary's refusal to perform an expedited statistical review of Strayhorn's petitions creates a burden on the political opportunities of her and her supporters. The evidence shows that "successful political

8

organization and campaigning" by a candidate for a statewide race in Texas requires as early of a start as possible and any delay has a significant adverse effect on the candidate's ability to raise money and get out her message. The delay occasioned by the Secretary's refusal to quickly review a sample of Strayhorn's petitions will cause just such burdens. Additionally, although the *Baer* and *Rosen* cases involved a continued burden on minor parties and independents relative to the major parties, a mere delay that by itself causes an impermissible burden on a candidate or her supporters is also subject to constitutional attack.

In *In re Carter-Mondale Reelection Committee, Inc.*, 642 F.2d 538 (D.C. Cir. 1980), the Carter-Mondale committee brought suit claiming that the Reagan-Bush campaign was not entitled to federal campaign funds due to alleged violations of federal law. *Id.* at 540-41. The court held that because the Reagan-Bush campaign had facially complied with the requirements for receiving federal funding, it would violate their First Amendment rights for the Federal Election Commission to delay their receipt of these funds pending an investigation of their opponents' claims. *Id.* at 544. This was true, despite the Carter-Mondale committee's assertion that the campaign funds were not really needed until later in the election cycle. *Id.* at 546-47. Had the FEC attempted to delay distribution of the campaign funds by adopting an unnecessarily lengthy review process, its actions would be equally violative of the First Amendment.

In the present case, although the Secretary does not hold Strayhorn's actual campaign funds, the evidence shows that he does in reality hold her campaign's purse strings in the form of his review of her petitions. Strayhorn's ability to effectively raise

campaign funds and buy mass media is dependent upon an indication from the Secretary that her petitions contain sufficient signatures to qualify for the ballot. Every additional day that the Secretary takes to provide results of his review is a day lost to the campaign that it cannot recoup. The delay of Strayhorn's ability to start an effective campaign is a significant burden on her and her supporters. *Cf. The Green Party v. Weiner*, No. 00 CIV. 6639, 2000 WL 1280913, at *3 (S.D.N.Y. Sep. 8, 2000) (noting that the Green "Party would be significantly hampered if dilatory procedures attributable to the paper ballot process delayed it in learning the identity of its candidate for the Senate, and therefore impaired its ability to begin an effective campaign in the short time between the primary and the general election").

    The Secretary will likely argue that no actual burden exists because their proposed review of each petition signature will take less time than a statistical review. However, the evidence in this case would belie that assertion. First, regardless of how long statistical samples took to perform in the past, they were conducted under a system that has now been superseded. The old system of sending out verifications to counties has been replaced by the centralization of data and verifications within the offices of the Secretary. Except for the functions carried out by the statistician, which the evidence shows are very short in duration, the process for verifying a sample is now be simply an extremely abbreviated version of checking the entire population of signatures. Because Plaintiffs have demonstrated a sufficient burden on their First and Fourteenth Amendment rights, the State must come forward with sufficiently weighty interests to justify the necessity of the burden.

C.  *The Secretary's Interests do not Justify the Burden on Plaintiffs' Rights*

Without knowing precisely what interests the Secretary will put forward to justify this burden on Plaintiffs' First and Fourteenth Amendment rights, Plaintiffs cannot conceive of what interests could possibly justify not performing an expeditious statistical review of Strayhorn's petitions. While the Secretary would be correct in arguing that he has discretion in choosing the method for verifying petition signatures, "this discretion must be exercised in subordination to relevant constitutional guaranties." *Rosen*, 970 F.2d at 175. The Secretary might have argued that he perceives the burden of delay as justified by having a complete account for certification purposes, except that Plaintiffs do not seek to require the Secretary to base his certification solely on the statistical sample. The Secretary may contend that he does not have the resources to verify a sample, however, in the past he has requested additional help when necessary to expedite a statistical review. (Nickless Depo., Ex. 2, p. 67).

The Secretary could also maintain that he is not authorized to perform a statistical sample that he does not use for certification purposes. Although this contention is not valid, even if it were true it would not overcome Plaintiffs' constitutional objections. Section 141.069 of the Texas Election Code provides permission for the Secretary to base his verification on statistical sampling if he so chooses. It is permissive and there is nothing in the Election Code that would prevent the Secretary from doing a statistical sample and then not relying on it for certification purposes. Indeed, the Secretary did so in 1996 when a statistical sample was inconclusive and could not show if the Natural Law Party had a sufficient number of

11

valid signatures with 95% confidence and the Secretary simply disregarded it. In that matter, despite the failure of the statistical sample to answer the question one way or the other, the Secretary utilized his discretion to simply put the party on the ballot, (Nickless Depo., Ex. 2, p. 96), which discretion he clearly had under section 141.065(b) of the Texas Election Code to treat any signatures accompanied by a circulator's affidavit as valid. Moreover, with the implementation of a brand new system it would seem prudent to do a statistical sample in order to estimate the number of valid petition signatures the Secretary should find as a simple check on the final results. Plaintiffs find nothing in the Election Code that would prohibit the Secretary from performing such a check and making the results known to the prospective candidates.

## CONCLUSION

Based upon the foregoing, Plaintiffs respectfully request the Court to enter the injunction prayed for.

Respectfully submitted,

RAY, WOOD & BONILLA, L.L.P.

By: _Randall B. Wood_
Randall B. Wood
State Bar No. 21905000
Doug W. Ray
State Bar No. 16599200

2700 Bee Caves Road #200
Austin, Texas 78746
(512) 328-8877 (Telephone)
(512) 328-1156 (Telecopier)

MINTON, BURTON, FOSTER& COLLINS,P.C.
Roy Q. Minton
State Bar No. 14186000

1100 Guadalupe Street
Austin, Texas 78701
(512) 476-4873 (Telephone)
(512) 479-8315 (Telecopier)
**ATTORNEYS FOR PLAINTIFF
CAROLE KEETON STRAYHORN**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiffs' Brief has been sent via certified mail, return receipt requested and via hand delivery, to the following:

Mr. Edward D. Burbach
Deputy Attorney General for Litigation
Office of the Texas Attorney General
Attorney General's Office
300 West 15th Street; 11th Floor
Austin, Texas 78701
**Attorneys for Defendant Roger Williams,
Texas Secretary of State**

on this the 27th day of April, 2006.

Randall B. Wood

f:\clients\01267\Brief

13