UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS
AUSTIN DIVISION

FILED
2006 APR 27 PM 5: 13
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
       DEPUTY

| | |
|---|---|
| CAROLE KEETON STRAYHORN, KIMBLE D. ROSS, DAVID MAYES MIDDLETON II, BARBARA RUUD, *Plaintiffs*, <br><br> v. <br><br> ROGER WILLIAMS, IN HIS OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE, *Defendant*. | § § § § § § § § § § § |

Civil Action No. A-05CA721LY
A:06CA 205 LY

## DEFENDANT'S TRIAL BRIEF

TO THE HONORABLE UNITED STATES DISTRICT JUDGE LEE YEAKEL

COMES NOW Defendant Roger Williams, in his official capacity as Texas Secretary of State (the "Secretary"), and files this Trial Brief. The Secretary would respectfully show as follows.

### I. SUMMARY OF THE ARGUMENT

Plaintiffs do not challenge the constitutionality of Texas' election laws. Instead, Plaintiffs assert alleged violations of their constitutional rights under the First and Fourteenth Amendments to the U.S. Constitution and allege violations of Texas Election laws "as applied" by the Secretary to her independent candidacy for Governor of Texas. Plaintiffs claims should be dismissed because:

1. Plaintiffs have failed to establish standing to maintain this action as they have not and can not establish any harm for which relief can be granted.;

2. Plaintiffs claims, if any, are not ripe as Strayhorn has yet to submit her Application to the Secretary;

3. Plaintiffs can not meet their burden on their federal constitutional claims;

4. Plaintiffs can not meet their burden on their state law claims; and

5. Plaintiffs viable claims, if any, are subject to dismissal pursuant to the Secretary's Eleventh Amendment immunity, sovereign immunity, qualified immunity, and/or official immunity, none of which are waived by the Secretary.

## II. BACKGROUND

On March 24, 2006, Plaintiffs Carole Keeton Strayhorn ("Strayhorn"), Kimble D. Ross, David Mayes Middleton II, and Barbara Ruud (hereafter collectively referred to as "Plaintiffs") filed this suit against the Secretary. Strayhorn is currently the Texas Comptroller of Public Accounts. She initially campaigned for the Republican nomination for governor of Texas but on January 2, 2006 timely filed with the Secretary a declaration of intent to run as an independent candidate for governor in the November 2006 general election pursuant to Texas Election Code §142.002(b). Plaintiffs Ross, Middleton and Ruud allege that they are each a "resident of the State of Texas, a registered voter in Texas, and a person who desires to vote for and campaign for the election of Strayhorn as governor." *See* Plaintiffs' Original Complaint at 1-2:2-4.

Despite the fact that Strayhorn has yet to file an Application, Plaintiffs allege that their federal constitutional rights under the First and Fourteenth Amendments are being violated by Secretary Williams. Plaintiffs seek the following remedies:

A. Declare that the Secretary's failure to use statistical sampling to review the validity of Strayhorn's petitions immediately upon receipt violates Plaintiffs' First and Fourteenth Amendment right to political association;

B. Grant Plaintiffs a mandatory injunction requiring the Secretary to review the validity of Strayhorn's petitions immediately upon receipt and in a manner that will produce a determination in the most expedited time possible.

B.[1] Declare that the Secretary's use of a manual review of Strayhorn's petitions violates section 141.032 of the Texas Election Code.

C. Grant Plaintiffs an injunction preventing the Secretary from using exclusively a non-statistical manual review to determine the validity of Strayhorn's petitions.

*See* Plaintiffs' Original Complaint at pp. 11-12 at Prayer. Plaintiffs further allege that:

> if a manual review will take longer than [statistical] sampling, then the Election Code will require a statistical review.
> ***
> Consequently, section 141.032(c), (e) of the Texas Election Code requires the Secretary to review Strayhorn's petitions immediately upon receipt using statistical sampling.

---

[1] Defendant quotes verbatim from Plaintiffs Original Complaint which contains two paragraphs labeled "B".

*See* Plaintiffs' Original Complaint at p.11, ¶¶ 28, 29.

Plaintiffs apparently base their claims upon statements made in a February 28, 2006 letter from the Secretary to Strayhorn Campaign Manager Brad McClellan in response to his February 27, 2006 queries. Specifically, McClellan asked:

> Whether your office will be able to provide a "reasonable" time for a statistical sampling test--<u>twenty-four hours</u>–or if your office insists on validating every signature-- to check validity of at least 20,000 signatures per day.

The Secretary responded:

> As you may know, I have a statutory duty to verify any petitions submitted by Ms. Strayhorn "...not later than the 55[th] day before general election day..." to certify her application for a place on the November ballot. Tex. Elec. Code §142.010(b). Furthermore, several methods of verification are available to me to accomplish the requirement of Section 142.010 of the Texas Election Code.
>
> Due to the fact that there are twelve (12) declarations of intent to run as an independent candidate for statewide offices filed with the Office of the Secretary of State, and there is a statutory prohibition against the signing of more than one petition for a particular office by an individual, I have determined that the most reliable and accurate method of verification of both the individual signatures and the necessary cross reference of those signatures with the other petitions is to physically check each signature on each petition. My office is currently investigating how best to implement this process and how long it will take. <u>It is my intent to undertake this task in the most expeditious manner possible</u> and I assure you that the approval process will be completed prior to the statutory deadline imposed by the Election Code.

Exhibit A at ¶ (4) (emphasis added); also attached to Plaintiffs' Original Complaint as Exhibit "A" at pp 2-3. It is important to note that despite implications to the contrary, the Secretary did not indicate that the certification process would take until September (i.e. until the 55th day before general election day). It is also interesting to note that statistical sampling has never been undertaken in 24 hours as suggested by Mr. McClellan. In fact, testimony taken in this matter

confirms that the certification process by statistical sampling in similar elections has typically taken approximately 2 months.

On or about March 27, 2006 Plaintiffs filed their Application for Preliminary Injunction. On March 29, 2006 the Court held an in chambers hearing wherein the Court set forth a schedule for obtaining evidence, filing briefs, and an expedited May 1, 2006 trial on the merits in lieu of a hearing on the application for an injunction. Plaintiffs advised that Strayhorn intended to submit her application and petitions to the Secretary during the week of April 10, 2006. *Id.* at 23:11-15. As of the date of filing of this brief, Strayhorn has submitted no application or petitions. Plaintiffs also advised that they may be amending their Complaint to more specifically allege their claims. *Id.* at 21:15, 22:12. On April 17, 2006, Defendant filed his "Motion for A More Definite Statement and Alternative Original Answer and Affirmative Defenses". Plaintiffs did not amend their Original Complaint.

On or about April 21, 2006, Plaintiffs filed a Motion for Pretrial [Settlement] Conference pursuant to Fed. R. Civ. P. 16. On April 26, 2006, the Court held the conference in chambers. At the conference Plaintiffs clarified that they would not be amending their Complaint. Plaintiffs also advised that they were not challenging the Secretary's certification of the candidates' names for placement on the general election ballot through the use of the review of every petition signature rather than through the use of statistical sampling. Instead, Plaintiffs advised that it was their belief that the Secretary has a legal duty to also run a "parallel statistical sampling" and advise Strayhorn of the results of the statistical sampling of the petitions filed with her application. Plaintiffs also clarified that their position is that prior to the January 2006 decision in *Francis*, candidates such as Strayhorn were required to turn in their petitions with their application and had no right to supplement same. However, Plaintiffs advised it is their position that the *Francis* decision created a right in favor of Strayhorn to submit her application and petitions and subsequently file more petitions.

For the reasons set forth below, Plaintiffs claims fail.

### III. STANDARD OF REVIEW

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Supreme Court "established a framework for examining state ballot-access laws." *Nader v. Connor*, 332 F.Supp.2d 982, 984 (W.D. Tex.), aff'd 388 F.3d 162 (5th Cir. 2004). "Under *Anderson*, a court must weigh the character and magnitude of the injury to the rights protected by the First and Fourteenth Amendments against the state's interests in justifying the requirements imposed by its election laws." *Id.* "The level of scrutiny applied to the state's requirements depends on the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." *Id.* Where "state law imposes only 'reasonable,' "nondiscriminatory" restrictions upon the First and Fourteenth Amendment rights of voters, the state's important regulatory interests are generally sufficient to justify the restrictions imposed." *Id.* at 988. "Each case must be resolved on its own facts, after due consideration is given to the practical effect of election laws of a given state, viewed in their totality." *Id.*

## IV. SECRETARY'S LEGAL DUTIES UNDER ELECTION CODE

Texas' "detailed statutory scheme for the regulation of major, medium, and minor political parties as it relates to the nomination of candidates for the general election ballot" is described at length in *Texas Independent Party v. Ronald Kirk*, 84 F.3d 178, 180 (5th Cir. 1996). "An independent candidate . . . is not subject to a primary, nor must he or she be nominated through the convention process". Therefore, the State has properly adopted different standards for independent candidates than for party candidates. *Nader v. Connor*, 332 F.Supp.2d at 984. The Secretary is required to "certify in writing for placement on the general election ballot the name of each candidate who files with the [Secretary] a declaration of intent that complies with Section 142.002(b)...and an application that complies with Section 142.004(b)". Texas Election Code § 142.010(a).

To be entitled to a place on the general election ballot as an independent candidate for governor, Strayhorn must not later than 5:00 p.m., May 11, 2006 file with the Secretary an application for a place on the ballot complying with Texas Election Code §141.031 <u>accompanied by</u>

a petition containing 45,540[2] valid signatures of voters registered in Texas meeting the requirements of the Texas Election Code ("the Application"). Texas Election Code §§ 142.004, 142.005, 141.062. The petition is considered part of the Application. Texas Election Code § 141.032 (c). None of the signers of the petition may have voted in this year's general primary election or runoff primary election of any political party that has nominated, at either election, a candidate governor. Texas Election Code § 142.008.

Duplicate signatures within a petition is always an issue of concern for the Secretary. However, this is the first major election within memory wherein at least two and perhaps as many as six independent gubernatorial candidates may submit Applications. Therefore, the Secretary must be prepared to deal with duplicate signatures, both within a single Application and between different Applications.[3] Specifically, a person may not sign the petition of more than one candidate for the same office in the same election. Texas Election Code § 141.066(a). A signature on a candidate's petition is invalid if the signer signed the petition subsequent to signing a petition of another candidate for governor. Texas Election Code § 141.066(c). To withdraw a signature from a petition, the signer must file a written request with the Secretary that the signature be withdrawn not later than the date that the petition is received by the Secretary or the seventh day before the petition filing deadline, whichever is earlier. Texas Election Code § 141.067.

On the filing of the Application, the Secretary is to "determine whether it complies with the requirements as to form, content and procedure that it must satisfy for the candidate's name to be placed on the ballot". Texas Election Code § 141.032(a). The review shall be completed as soon as practicable after the date the application is received. However, the petition is not considered part

---

[2] One percent of the total vote received by all candidates for governor in the most recent gubernatorial general election. Texas Election Code § 142.007(a). *See also* Plaintiffs' Original Complaint at 2:7.

[3] As set forth below, in support of their argument that statistical sampling must be undertaken by the Secretary, Plaintiffs totally ignore the duplicate signature issue. In fact, so much so, that Plaintiffs expert statistician, Jerry Olson, actually testified that he was instructed by Plaittiffs' counsel to not consider the issue of duplicate signatures. OLSON DEPO at 36:6, 39:2.

of the Application for purposes of determining compliance with the requirements applicable to each document, and a deficiency in the requirements for one document may not be remedied by the contents of the other document. Texas Election Code § 141.032(c). If the Application does not comply with the applicable requirements, the Secretary is required to reject the Application and immediately deliver to the candidate written notice of the reason for the rejection. Texas Election Code § 141.032(e). Not later than the 55th day before general election day (i.e. September 2006), the Secretary is required to deliver the certification to the authority responsible for having the official ballot prepared in each county in which the independent candidate for governor's name is to appear on the ballot. Texas Election Code § 142.010 (b).

In performing his review of the petitions, the Secretary is authorized to use statistical sampling. ELECTION CODE § 141.069. However, the Secretary is not required to use statistical sampling. Contrary to Strayhorn's assertion, the availability of statistical sampling is simply a tool that the Texas Legislature has provided to allow the Secretary to meet the 55-day Deadline.

## V. SUMMARY OF TESTIMONY

*The effect of advances in the law and technology.* The State has an interest in ensuring that the Secretary only certifies candidates that have timely and properly filed 45,450 valid signatures of voters registered in Texas meeting the requirements of the Texas Election Code. It is undisputed that the Secretary has at his disposal three practical methods of satisfying his obligation. The Secretary is to check every signature, or he may accept the affidavit of the circulator supporting each part of the petition signatures that he or she witnessed, or he may utilize statistical sampling. NICKLESS DEPO 42:18-24 [36:24-37:11]; Texas Election Code §§ 141.065, 141.069, 142.010, 142.004(b), 141.062.

Checking every signature is the most accurate method of satisfying the Secretary's obligations. It has and continues to be used to check Applications that require the submission of only 500 signatures. NICKLESS DEPO 18:21 - 19:11. However, concerns regarding the cost and time involved in checking every signature has, in the past, lead to the use of the options of accepting the affidavit of the circulators or using statistical sampling. Now, as set forth below, advances in law

and technology have made checking every signature the most accurate, efficient, and practicable option for the 2006 general elections, including the gubernatorial election.

This first option to checking every signature, accepting the affidavit of the circulators, is merely an optional method of checking signatures which the Legislature has determined that the Secretary may utilize. Texas Election Code § 141.065 ("the [Secretary] *may* treat as valid each signature to which the affidavit applies, without further verification, unless proven otherwise"). Accepting the affidavit of the circulators leads to the least accurate results and, especially in elections requiring the reviewing of numerous signatures, has not been utilized. NICKLESS DEPO 36:24-37:10.

The second option to checking every signature, statistical sampling, is similarly not required to be used by the Secretary. Texas Election Code § 141.069 ("the [Secretary] *may* use as the basis for the verification any reasonable statistical sampling method that ensures an accuracy rates of at least 95 percent"). In fact, the option to utilize statistical sampling was not made available until 1975. 64th Leg. p. 2078, Ch. 681 § 18. The Code does not even specify the type of statistical sampling that should be used. The reason for this is clear. Statistical sampling is part art, part science, that, at best, results in less accuracy than checking every signature. NICKLESS DEPO 7:2-3, 74:2-5. In fact, the law allows utilizing statistical sampling with an accuracy rate of 95%. Texas Election Code § 141.069.

The Secretary's Director of Elections, Ann McGeehan, has served in that position for ten and one half years and been at the Secretary's office for sixteen years. MCGEEHAN DEPO 4:16-5:9. Similarly, Melinda Nickless, who is supervised by Ms. McGeehan, has been employed by the Secretary of State's office for over 30 years and with the Elections Division since 1981. NICKLESS DEPO at 6:10, 7:19, 58:4-11. Ms. McGeehan and Ms. Nickless testified at length regarding the efforts that have been undertaken by the Secretary to ensure that his review and certification of each signature is completed as soon as practicable after the Applications are received. NICKLESS DEPO 37:14, 59:20; MCGEEHAN DEPO p. 4:15-13:11.

As with previous elections, the first thing that the McGeehan, Nickless and their colleagues will do when they receives an Application is do a facial review of the Application and petitions.

NICKLESS DEPO 54:14- 57:21. They will then bates stamp and make true and accurate copies of the petition. *Id.* The copies will be sent to an outside vendor, TELA Technologies, which will enter the information on the petitions into an electronic database. *Id.* TELA will then return the database in electronic format to the Secretary's office. *Id.* The data will be loaded into the Secretary's Oracle system to begin running field queries against the voter registration and history database. *Id.* At the same time, the data will be checked for duplicate signatures. *Id.* Any inconclusive data will be analyzed by the Secretary's staff. *Id.* At that point the Secretary should be able to very quickly determine whether or not to certify the candidate. *Id.*

*First Election Pursuant to Help America Vote Act of 2002.* Importantly, the November 2006 election will be the first statewide election held pursuant to the Help America Vote Act of 2002. NICKLESS DEPO 47:9-12. For the first time, the official list of registered voters against which petition signatures are checked will be the list maintained by the Secretary's office. NICKLESS DEPO 24:5-25:67; 47:19-23. In addition, voter history is now electronically available to the Secretary. *Id.*

Two hundred twelve (212) of the less populous counties now maintain their voter information on the Secretary's computer system. NICKLESS DEPO 24:14-21. The largest "online county" is Nueces (which includes Corpus Christi). NICKLESS DEPO 49:7-12. None of the most populous counties, including, but not limited to, Harris, Dallas, Bexar, Travis or El Paso counties are online. NICKLESS DEPO 48:21-49:6. For purposes of the upcoming signature verification effort, the Secretary requested these "offline" counties to upload their voter history information by April 24, 2006. NICKLESS DEPO 24:18-25:3. The remaining counties were asked by the Secretary to electronically transfer their voter history records from the 2006 primary elections and run offs to the Secretary by April 24. *Id.* This means that, for the first time, verification of both voter registration and voter history can be performed centrally and electronically at the Secretary's office rather than piecemeal at numerous county clerks' offices. *Id.*; NICKLESS DEPO 83:11-84:4. This should allow validation of the data without requiring any additional time beyond what has been required in the past using statistical sampling. NICKLESS DEPO 83:24-84:4.

*Because of Strong Likelihood of Some Overlap Secretary Opts for a Complete Review.*

In light of these changes in the law and technology and the unusual number of independent candidates, the Secretary made the decision to check every signature. The Secretary wants the review of their petitions to be as accurate as reasonably possible [the "Complete Review"]. NICKLESS DEPO 26:13-28:10; 42:25-43:4.

*Secretary Awards Contract for Review of Petition Signatures Within Four (4) Weeks to a Qualified Vendor (TELA Technologies).* There is uncertainty regarding how many potential independent gubernatorial candidates will submit Applications and petitions. NICKLESS DEPO 29:13-19, 45:15-21 and Exhibit 2. The Secretary of State does not have the staff available to do significant data entry. *Id.* It was thus determined that it would be most practicable to contract with an outside vendor to assist with the review of the petitions to get the job done as fast as possible. *Id.*. Ms. McGeehan, Ms. Nickless and others worked to develop criteria to identify an appropriate vendor. Nickless Depo 29:5-12; McGeehan Depo 5:13-6:7. On March 21, 2006, the Secretary issued a request for offers ("RFO") to enter the information on the petitions into an electronic database. NICKLESS DEPO 45:15-46:1 and Exhibit "2" thereto at AMMN 1-21. Offers were due back from potential bidders on April 4, 2006. *Id.*

The RFO contained many requirements, not least of which was a requirement of at least ninety-nine percent (99%) accuracy. NICKLESS DEPO 30:24-31:1. In addition, the Secretary is required to deliver hard copies of the petitions to the vendor as early as May 8, 2006, but no later than May 18, 2006. Nickless Depo 46:10-47:8. The reason for the range of dates is that when the RFO was sent out (and in fact today) the Secretary does not know how many Applications or how many petitions will be filed with the Secretary. The Secretary only knows that they must be filed by the candidates no later than May 11. *Id.* The vendor is required to return the data on or before June 15, 2006. NICKLESS DEPO 46:10-14. This deadline represents a maximum of four weeks from the date (May 8 through May 18) that the Secretary's office has agreed to deliver hard-copy of the petitions to the vendor. NICKLESS DEPO 46:20-24.

The Secretary received eight offers, three of which were rejected up front by the Secretary's Procurement Division for failing to satisfy the Secretary's specifications. NICKLESS DEPO 31:19-25.

A team of three staffers was formed to review the offers. The team consisted of Ms. Nickless, Ann McGeehan, and the Secretary of State's IT Director, Scott Brandt. Nickless Depo 58:18-59:20. On April 10, 2006, the contract was awarded to TELA Technologies. NICKLESS DEPO 46:2-9. . Political considerations played no part in the award of this contract. NICKLESS DEPO 59:1-6. To achieve the ninety nine percent accuracy required by the Secretary, TELA Technologies has agreed to input each signature two separate times. NICKLESS DEPO 31:5-6.

*Speed of Final Verification After Transmittal of Computerized Data Depends on Quality.* After it receives the computerized petition data from TELA Technologies, the Secretary's office will cross-check it against voter registration and voter history information in the Secretary's database. NICKLESS DEPO 55:14-56:5. They will perform two different types of duplicate checks within the same petition and compared to the other petitions. NICKLESS DEPO 56:6-19. The Secretary's office hopes to be able to complete this step "very quickly." NICKLESS DEPO 57:15. In fact, ideally, this process would take only minutes. NICKLESS DEPO 85:21-24. However, experience teaches that at least some of the data is frequently inconclusive. NICKLESS DEPO 57:1-7. The number of such instances depends on the "due diligence of the circulator." NICKLESS DEPO 83:6-7.

*Timing of Cross-Checking Also Depends on When Last Petition is Submitted.* Pursuant to Election Code § 141.066, the signatures on each petition must be cross-checked against every other petition. Obviously, this final step cannot occur until the last Application and associated petitions have been submitted.

*Secretary's Automated Cross-Checking Database.* TELA Technologies will submit the computerized data to the Secretary in Oracle database format. MCGEEHAN DEPO 6:12-18. The Secretary's office has used the Oracle database for years. MCGEEHAN DEPO 6:19-21. The cross-checking of petition signatures will be accomplished with what are known as "queries" to the database. MCGEEHAN DEPO 6:22-7:5. The Secretary's IT Department expects to perform these database queries without any difficulty. MCGEEHAN DEPO 7:6-10. This confidence is warranted in light of the fact that the query process is very similar to the duplicate voter record queries that the IT Department is already performing. MCGEEHAN DEPO 8:13-18.

*Prior Use of Statistical Sampling.* Plaintiffs' expert statistician, Jerome Olson, testified that statistical sampling methodology proposed by Plaintiffs herein is the identical methodology that has been used by the Secretary of State's office. OLSON DEPO 9:2-10:14. There have not been many instances of the use of statistical sampling of certifying petitions signatures in Texas elections. NICKLESS DEPO 6:10-16:19. In certain instance (including the petition submitted by the Natural Law Party in 1996), the Secretary's office has no choice but to inform the applicant that, despite their best efforts to verify a petition through statistical sampling, the results are inconclusive. NICKLESS DEPO 62:12-15. For this reason, the Election Code requires only ninety-five percent (95%) accuracy when statistical sampling is employed. NICKLESS DEPO 74:6-8. The Secretary of State's office has utilized statistical sampling to review the 1992 Ross Perot Application [Myers May 27, 1992 Report, NICKLESS DEPO Exhibit 2 at AM/MN 90-95], the 1996 Perot [NICKLESS DEPO Exhibit 2 at AM/MN 101-104], U.S. Taxpayers Party [Myers June 25, 1996 Report, NICKLESS DEPO Exhibit 2 at AM/MN 105-108], Natural Law Party [Garza August 5, 1996 letter to Bonsell, NICKLESS DEPO Exhibit 2 at AM/MN 96, Myers June 25, 1996 Report, NICKLESS DEPO Exhibit 2 at AM/MN 97-100], and Green Party Applications [NICKLESS DEPO Exhibit 2 at AM/MN 122-3], and the 2000 Buchanan [McGeehan July 14, 2000 letter to Buchanan, NICKLESS DEPO Exhibit 2 at AM/MN 86, Myers July 2, 2000 Report, NICKLESS DEPO Exhibit 2 at AM/MN 87-89], Green Party [McGeehan August 8, 2000 letter to Hayes and Agan, NICKLESS DEPO Exhibit 2 at AM/MN 82 and Myers July 31, 2000 Report, NICKLESS DEPO Exhibit 2 at AM/MN 83-85], and Natural Law Party [Ann McGeehan August 15, 2000 letter to Hazel Chandler NICKLESS DEPO Exhibit 2 at AM/MN 78 and Myers August 7, 2000 Report NICKLESS DEPO Exhibit 2 at AM/MN 79-81] Applications. Id.[4]

*This history establishes that certifying petitions signatures through the use of statistical sampling has not been the expeditious process portrayed by Plaintiffs.* In all but one anomalous

---

[4]Statistical sampling was not used in 2004 to certify any Application. Instead, statistical sampling was utilized to "shed light on when signatures were gathered" for the untimely Application filed by Ralph Nader (NICKLESS DEPO Exhibit 2 at AMN/MN 25-29) and to informally review only the petition signatures ultimately submitted by Nader. *Id.* At AM/MN 30-32.

election, the process of certification through the use of statistical sampling has taken between one and one-half and three months. Indeed, the general rule has been that petition verification takes two months, even when statistical sampling is employed. NICKLESS DEPO 98:13-20, 103:6-9.

Part of the reason for this timeframe is that, whether or not statistical sampling is ultimately, the Secretary's staff is required to perform significant preliminary work to prepare petitions for review. NICKLESS DEPO 22:25-23:9. This includes performing an initial count of the signatures to ensure that the petition does in fact purport to contain at least the requisite minimum number and duplicating and numbering all of the petition pages. NICKLESS DEPO 23:7-9, 35:3-6, 53:3-6, 54:14-20. Copies of the petition pages (or a subset thereof, where statistical sampling is employed) are sent to various county election offices for verification of voter registration and voting history. NICKLESS DEPO 23:11-24:4.

*Review of the 1992 Perot Petition (Which Required Three Weeks) Was the Exception.* It is true that the certification of the 1992 Perot Application took almost four weeks. However, Ms. Nickless testified that Perot's 1992 Application was an "anomoly". NICKLESS DEPO 54:5-13. Unlike the situation at issue herein, in 1992 Perot was the only independent candidate for a major political office seeking certification on the general election ballot. Therefore, only his petitions needed to be reviewed. Although he was required to submit 54,275 petition signatures, he filed an Application with over 220,000 petition signatures; that is, ***more than 4 times the required amount***. NICKLESS DEPO 9:23-10:4, 20:19-22. As a result, the statistical sampling methodology required that only 108 signatures had to be verified.[5] In addition, his petitions were very well organized and labeled – a situation Ms. Nickless described as an "anomaly." NICKLESS DEPO 54:5-13. By May 27, 1992 letter to Perot, Secretary of State Hannah confirmed Perot's place on the ballot. NICKLESS DEPO Exhibit 2 at AMN/MN 73.

---

[5]The number of samples needed to be checked is inversely related to the number of petition signatures submitted. That is, the more signatures submitted, the less samples that need to be checked.

*Statistical Sampling is Not an Exact Science.* Ms. Nickless has been involved in every petition verification that the Secretary of State's office has ever done since she joined its Elections Division 25 years ago. NICKLESS DEPO 8:25-9:5. Statistical sampling is not an exact science. NICKLESS DEPO 7:2-3, 74:2-5. In fact, in 1996 the Natural Party's Application was reviewed by the Secretary of State's office through the use of statistical sampling. Unfortunately, after repeated attempts over several months, by letter dated August 5, 1996 Secretary of State Garza advised the Chair of the Natural Law Party that the results were inconclusive. NICKLESS DEPO 61:23-62:20; NICKLESS DEPO Exhibit 2 at AM/MN 96-100. Nevertheless, in his discretion, Secretary Garza decided to certifying the party's place on the ballot. This is because the results of statistical sampling may show that there was a range of signatures that that petition could have on it, and the number that is needed by law was within the middle of that, was in that range. NICKLESS DEPO 76:11-24. In certain instance (including the petition submitted by the Natural Law Party in 1996), the Secretary's office has no choice but to inform the applicant that, despite their best efforts to verify a petition through statistical sampling, the results are inconclusive. NICKLESS DEPO 61:23-62:20. For this reason, the Election Code requires only ninety-five percent (95%) accuracy when statistical sampling is employed.. NICKLESS DEPO 74:6-8.

*Six Independent Candidates Seek Access to Ballot for Gubernatorial Election.* Six candidates – Carole Keeton Strayhorn, Richard S. "Kinky" Friedman, Marcus Matthew Cherry, Michael (Mike) Raymond Redlich, Larry W. Camp, William Gilbert Jean – have timely filed declarations of intent to run as independent candidates in the November 2006 gubernatorial election. McGeehan Depo at 8:9-16 and at Exhibit 1; also at http://www.sos.state.tx.us/elections/forms/candidates/inddec.pdf (visited April 24, 2006).[6] This could lead to as many as 300,000 total signatures on various ballot-access petitions filed with the Applications of independent candidates for governor. NICKLESS DEPO 53:7-11. In addition, three

---

[6]In addition, the Secretary's office may receive up to three ballot-access petitions from smaller political parties (the the Green Party, the Reform Party, and the Constitution Party) who may (if successful) present gubernatorial candidates. NICKLESS DEPO 38:23-39:3. This could lead to a total of nine candidates for Governor. NICKLESS DEPO 39:4-7.

minor political parties have timely filed their intention to be on the general election ballot, including the race for governor. The parties are the Green Party, the Reform Party, and Constituion Party. McGeehan Depo 12:3-10. The Secretary will be required to review and certify the petitions submitted by these parties.

Amazingly, one of the Plaintiffs offered testimony that the Secretary must discount these other candidates and conduct statistical sampling on Strayhorn's Applications only. ROSS DEPO 61:3-63:6. Two others testified that they could not conceive of **any** circumstances that would justify the Secretary in performing a manual review of all signatures. MIDDLETON DEPO 26:5-13, RUUD DEPO 31:24-32:10. Although Plaintiffs dismiss the candidacies of their intended opponents as being irrelevant, the Secretary is not at liberty to do so.

In addition, there are 22 other declared independent candidates for other offices up for election in the 2006 general election who are required to file Applications with petitions with the Secretary. MCGEEHAN DEPO 8:19-9:6 and Exhibit 1. The Secretary must assume that these candidates will timely submit the required signatures. As such, the Secretary must assume that Applications with as many as [45,450 x 22 = 999,900] signatures will be filed by these candidates.

In essence, Plaintiffs are asking that the Secretary create a process that would put her Application and petitions at the front of the line of all independent and minor party candidates in all races.. The Education Code provides the Secretary with no such authority nor should it.

**The testimony of Plaintiffs and their witnesses undermine Plaintiffs' claims.**

Defendant served deposition notices and subpoenas duces tecum upon every one of the Plaintiffs who chose to testify and Plaintiffs' witnesses. Ross Depo Exhibit 1; Middleton Depo Exhibit 1; Rudd Depo Exhibit 1; Middleton Depo Exhibit 1; McClung Depo Exhibit 1; Olson Depo Exhibit 1; Sherbet Depo Exhibit 1, and Sanders Depo Exhibit 1.[1] With the exception of Dr. Olson, the Plaintiffs who chose to testify and Plaintiffs' witnesses produced absolutely no

---

[1] Plaintiffs originally indicated that they would be calling the woman in charge of Strayhorn's petition drive, Susan Johnson, as a witnesses. Defendant thus noticed the deposition subpoena duces tecum of Susan Johnson. However, Plaintiffs chose not to call Ms. Johnson as a witness.