documents in support of Plaintiffs' claims or otherwise in response to the subpoenas. The testimony of Plaintiffs and their witnesses undermine Plaintiffs' claims.

Plaintiffs only expert witness, Ph. D. economist and statistician Dr. Jerome Olson, merely produced a one page April 18, 2006 report memo to Plaintiffs' lead counsel and his six page resume. Olson depo 17:7-27:17; Olson Exhibit 2. His memo's "Conclusion" is that "It is my expert opinion that time and effort can be saved by sampling". Olson Exhibit 2 at para. 5. The only information he had to construct his memo was gained through sitting through Ms. Nickless' deposition and information orally provided to him by Plaintiffs' lead counsel. Olson Depo 17:7-29:12. He admitted that he neither reviewed nor relied upon any documents in preparing his memo other than documents (which he could not remember) that he had seen as he sat watching Ms. Nickless' deposition.. Dr. Olson testified that if he were checking the signatures he would use the same statistical sampling methodology that the Secretary of State's office has used in the past. Olson Depo 9:2-10:1. He testified that he would use statistical sampling because of its benefit of "cost and speed". Olson Depo Exhibit 2 at para. 2.

Dr. Olson could not specify the cost savings. With regard to speed, Dr. Olson clarified that he believes that his opinion is what will take a "long time" is not the computer work (which will take "not very long") but rather the time it will take to transport the signatures to Tela, for Tela to input the information into the database, and for Tela to return the database to the Secretary. Olson Depo 29:24-30:25. In short, he is concerned about the <u>maximum</u> 4 weeks that Tela has to return the database to the Secretary under the RFO. Of course, that 4 weeks is significantly less time than statistical sampling has taken in the past in all occasions but 1992 Perot.

Interestingly, in assuming that accuracy can be easily increased by "increasing the sample size", he also assumed "a very simple statistical model". Olson Depo Exhibit 2 at para. 3. The only problem is that his "very simple statistical model" intentionally ignores the very important issue in this election of duplicate signatures. *Id.* He adopted this model at the instruction of Plaintiffs' counsel. Similarly, Dr. Olson's memo erroneously states that the "complete

enumeration of signatures could take 45 times as much efforts as taking a sample". Olson Depo Exhibit 2 at para. 4. However, he admitted that this would only be true if one assumed that it takes twice as long (and costs twice as much) to check 2 signatures rather than 1. Olson Depo 33:21-36:5.

Dr. Olson did not even know how many people have timely filed their intention to run as Independent candidates for governor. Olson Depo 27:18-20.

Dr. Olson further testified and his memo reflects that it his belief that the past statistical sampling has only required "sample sizes ranged from a low near 100 to a high of just under 500". Olson Depo Exhibit 2 at para. 4. He is incorrect. Documents produced during Ms. Nickless' deposition reflect that sample sizes have been been more than twice the number assumed by Dr. Olson. For example, a 1200 random pair sample was uitlized in the 1996 Perot statistical sampling. NICKLESS DEPO Exhibit 2 at AM/MN 101. In most cases, more than 500 samples have been used. *See* AM/MN 79 (1000 samples 2000 Natural Law Party ), AM/MN 97 (600 samples 1996 Natural Law Party), AM/MN 83 (600 samples 2000 Green Party), AM/MN 105 (600 samples 1996 Natural Law Party). He admitted that until all Applications and petitions are turned in, it is speculation to estimate the size of the samples needed. Olson Depo 41:18-42:25.

Dr. Olson testified about his concerns regarding the Secretary's review of the Applications. Olson Depo 4:21-9:1. He testified that there is a "potential for error" by the vendor (Tela, whose name he did not know) in keying in the data. *Id.* Importantly, Olson admitted that he has no computer training other than courses in the mid 1970's during graduate school on a computer language then known as "PL-1". *Id.* at 27:21-29:7. Instead, he based this belief upon his experiences in "the mid 80"s" working :

> with various lawyers on voting rights cases, where I was required
> to match a list of voter registration against a list of Hispanic names
> to determine the percent of the population in the precinct that was
> Hispanic, and I had to write programs to match the names between
> these two sources of data. It was extremely difficult".

*Id.* He then testified that "the new technology is new. It's untested. There's no way to tell whether it's going to be better or not". *Id.* The only problem with this testimony is that it is not true. The technology is not new. The signature data is simply being entered into a database by Tela that will be electronically imported into the Secretary's Oracle system. Olson admitted that he is not familiar with the Tela or their capabilities. *Id.* at 27:21-29:7. Field queries will be run against the database. *Id.* In addition, the method has been tested by the Secretary's I.T. department which has reported that it should work with no problems. *Id.* Olson admitted that he is not familiar with the Secretary's I.T. personnel. *Id.* at 27:21-29:7.

The testimony of Plaintiffs and Plaintiffs' witnesses are fatal to their claims. No Plaintiff or Plaintiffs' witness was able to identify anything that he or she was not able to do because of the Secretary's decision to check every signature. For example, no Plaintiff or Plaintiffs witness has testified that they have been or will be unable to sign Strayhorn's petition, volunteer for, contribute to, campaign for, and/or solicit signatures for Strayhorn. (other than McClung who is not eligible because he resides in New Orleans). Similarly, Plaintiffs and their witnesses identified absolutely no one that has or will be unable to sign Strayhorn's petition, volunteer for, contribute to, campaign for, and/or solicit signatures for Strayhorn.

Plaintiffs "fact witness" political consultant Dan McClung in fact knew virtually no facts at all about the gubernatorial race or the Strayhorn campaign. *See* McClung Depo. He did, however, testify that things other than the Secretary's decision to check every signature that court hurt a campaign; things such as having changed your last name 4 times and switching party afilliations. McClung Depo 23:25-24:25, 41:23-43:17. Although on direct McClung testified that "based entirely on [his] experience" he thought Strayhorn might have difficulty buying advertising time during the local network evening and night news, he could identify no television

DEFENDANT'S TRIAL BRIEF                                                                                           Page 18

stations or other media outlets that have said that they will not run her ads. McClung Depo 34:21-39:23. His last experience in a Texas statewide race was Paul Hobby's 1998 Democratic primary race for Comptroller. McClung Depo 22:13-23:16. The only previous Texas statewide campaign that he specifically identified was Lloyd Bentson's. McClung Depo 13:23-14:16. He admitted that in the last decade, with the spread of cable TV, a candidate has many options in buying TV ad time. McClung Depo 37:5-20. He was not aware that Strayhorn was able to run advertisements in every major Texas media market while she was still in the Republican primary. McClung Depo 44:10-13. McClung was not familiar with Strayhorn's web site McClung Depo 35:25-36:20.

*Strayhorn Campaign's Decision to Delay Submission of Petition Signatures In Order to Be "Prudent."* When asked in his deposition on April 25, 2006 whether Strayhorn already has the minimum requisite number of signatures, her Communications Director Mark Sanders responded "absolutely." SANDERS DEPO 55:4-5. He indicated that Strayhorn is delaying submission of these signatures in order to be "prudent" SANDERS DEPO 76:21-77:2. However, he acknowledged that there is no legal prohibition preventing Strayhorn from submitting her signatures immediately. SANDERS DEPO 66:25-67:5.

## VI. ARGUMENT

A.  **None of the Plaintiffs Have Standing to Maintain this Action.**

To establish his or her own standing to sue, a plaintiff must make a three-pronged showing of: (1) an injury in fact – a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical; (2) causation – a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and (3) redressability – a likelihood that the requested relief will redress the alleged injury. *Steel Company v. Citizens For*

*A Better Environment*, 523 U.S. 83, 103 (1998). This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence. *Id.* at 103-104. Failure to establish any one deprives the federal courts of jurisdiction to hear the suit. *Id.* at 103. Standing is a threshold jurisdictional issue that the Court must evaluate before addressing the merits of a plaintiff's action. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 180 (2000). None of the Plaintiffs have demonstrated a concrete injury in fact fairly traceable to any action by the Secretary.

### 1. Carole Strayhorn

Strayhorn, through her Communications Director Mark Sanders, identified several areas in which she believes potential delay in the certification of her candidacy may impair her ability to run an effective campaign. However, Plaintiffs present no evidence of specific evidence of harm and Sanders at the same time acknowledged that the campaign has not yet suffered any concrete harm in any of these areas.

#### i. Fundraising

Plaintiffs claim that the delay in certification undermines Strayhorn's fundraising ability. However, Sanders acknowledged that Strayhorn already had $8.1 million of cash on hand as of January 2006. SANDERS DEPO 69:17-22. Among all the gubernatorial candidates she ranks a close second to incumbent Rick Perry's $9 million. SANDERS DEPO 69:23-70:16. In fact, she had more than *sixty-two times* as much cash on hand as Democratic candidate Chris Bell ($130,000). SANDERS DEPO 69:23-70:16.

#### ii. "Earned" Media Coverage

Plaintiffs claim that delay also reduces the amount of favorable press coverage (referred to as "earned media" to distinguish it from purchased advertising). However, Sanders was unwilling to say that he was dissatisfied with the "earned media" coverage that Strayhorn has received. SANDERS DEPO 68:6-13.

### iii.    Purchased Media (Advertising)

Plaintiffs claim that delay impedes Strayhorn's ability to purchase advertising in the media at favorable rates. However, Sanders acknowledged that Strayhorn has not yet attempted to purchase any advertising and would not have done so even if she were guaranteed favorable rates. SANDERS DEPO 80:11-81:5. In fact, Sanders is unaware that any candidate (including Perry) has purchased any advertising to date. SANDERS DEPO 81:7-12.

### iv.    Volunteers

Plaintiffs claim that delay impedes Strayhorn's ability to recruit volunteers. However, Sanders acknowledged the adequacy of Strayhorn's volunteer recruitment efforts. SANDERS DEPO 60:11-13, 74:22-75:1.

### 2.    Other Plaintiffs

None of the other Plaintiffs read the Complaint prior to the filing thereof on their behalf. ROSS DEPO 25:6-21, MIDDLETON DEPO 10:19-20, RUUD DEPO 6:21-22. Nevertheless, all three Plaintiffs agreed with the generic assertions therein that delay will injure the Strayhorn campaign in some intangible manner. However, like Mr. Sanders, none of them could identify a concrete harm that the campaign has suffered as a result of any actions by the Secretary.

Even if the these Plaintiffs could allege such a harm to the Strayhorn campaign, this would be insufficient to confer standing upon *them*. In order to raise a claim on behalf of a third-party, a litigant must "demonstrate that he or she has suffered a concrete, redressable injury, that

he or she has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her own interests." *Edmonson v. Leesville Concrete Company, Inc.*, 500 U.S. 614, 629 (1991). The other Plaintiffs have not alleged an injury to themselves or a hindrance to Strayhorn's ability to protect her own interest (indeed, she is already a party).

### B. Plaintiffs' Claims Are Not Yet Ripe.

"The ripeness doctrine counsels against premature adjudication by distinguishing matters that are hypothetical or speculative from those that are poised for judicial review." *LeClerc v. Webb*, 419 F.3d 405, 413-14 (5th Cir. 2005) (internal quotation marks and citation omitted). Here, however, Plaintiffs allege only hypothetical and speculative injury. They invite the Court to engage in a number of assumptions, including: 1.) that Strayhorn will submit an adequate number of signatures, 2.) that the Secretary will delay his review thereof, and 3.) that numerous third parties (including potential contributors and various media outlets) will take certain negative actions in response to the delay. This chain of speculation is simply too long and attenuated to satisfy Article III.

### C. Plaintiffs Can Not Meet Their Burden on Their Federal Constitutional Claims.

To resolve Plaintiffs' Constitutional claims, the Court "must weigh the character and magnitude of the injury to the rights protected by the First and Fourteenth Amendments against the state's interests in justifying the requirements imposed by its election laws." *Nader*, 332 F.Supp.2d at 984. Plaintiffs fail to meet their burden of proof on both elements.

#### 1. The Secretary's Actions Do Not Impinge Any Cognizable – Let Alone Significant – Constitutional Rights of Plaintiffs.

As noted *supra*, none of the Plaintiffs has alleged a concrete injury fairly traceable to the actions of the Secretary. Therefore, Plaintiffs lack standing and this Court lacks Article III jurisdiction. however, even assuming arguendo that they have adequately alleged an injury in fact, they certainly have not alleged an injury cognizable under the First or Fourteenth Amendments. Specifically, Plaintiffs have no caselaw support for the proposition that they have a Constitutional right not only to appear on the ballot (Strayhorn) and vote for the candidate of their choice (other Plaintiffs) but to be (or vote for) a "legitimate" candidate. The cases cited by Plaintiffs as purportedly stating such a novel proposition are inapposite.

In *Smith v. Clark*, 189 F.Supp. 2d 529 (S.D.Miss. 2002), a three-judge panel approved a Congressional redistricting plan ordered by a State Court. The *Smith* panel did not, as Plaintiffs suggest, recognize the right to be placed on the ballot as early as possible. Rather, it upheld a Congressional redistricting plan ordered by a Mississippi court. In doing so, it declined to further postpone its consideration of the plan to await a preclearance determination on the plan from the United States Department of Justice because of the panel's concern that this might run afoul of the relevant statutory deadline under Mississippi law and "contravene the Mississippi Supreme Court's recognition of the importance of such deadlines under state election law." *Smith*, 189 F.Supp.2d at 536. Here, by contrast, Staryhorn fails to allege that the Complete Review will not be complete by the 55-day Deadline.

In *The Green Party v. Weiner*, 2000 WL 1280913 (S.D.N.Y. 2000), the court refused to require state officials to conduct the Green Party primary in New York City with electronic (as opposed to paper) balloting, even though electronic balloting was to be used elsewhere in the state. Unlike the instant case, *Weiner* involved not the tabulation by state election officials of petition signatures, but rather the Green Party's conduct of its own internal primary. Specifically,

state election officials declined to use electronic voting machines to conduct this primary in New York City, which contained roughly 1640 Green Party members. The court rejected plaintiffs' argument that the threat of delay posed by paper ballots warranted a preliminary injunction, explaining as follows:

> [P]laintiffs have not shown the threat of irreparable injury. Any denial of the right to vote is a serious matter. But it is entirely speculative whether any member of the party would suffer such deprivation in a properly-conducted election using paper ballots, and there is no reason to think that the Party's ability to compete in the general election or the outcome of the primary will be affected by the challenged practices. The only question in this regard concerns the ability of the Board to render a prompt count of paper ballots. The Party would be significantly hampered if dilatory procedures attributable to the paper ballot process delayed it in learning the identity of its candidate for the Senate, and therefore impaired its ability to begin an effective campaign in the **short time between the primary and the general election**. Any such delay would be particularly incomprehensible, however, in light of the Board's heavy emphasis on the small size of the electorate involved. Given that the Green Party senatorial primary outside New York City will apparently be conducted on machines, and that the defendants have represented that a preliminary count in the City will be available within 48 hours, I cannot conclude that these procedures pose an undue and irreparable burden on the party's ability to conduct a general election campaign.

2000 WL 1280913, *3 (emphasis added).

The "short time period" referred to by the *Weiner* court was a period of approximately fifty six days between the primary election (September 12, 2000) and the general election (November 7, 2000). The *Weiner* court found no reason to believe that the process of tabulating the paper ballots would extend into this period. Similarly, Staryhorn fails to allege that the Complete Review will not be accomplished by the 55-day Deadline.

    **2.**    **The Secretary Has A Strong Interest in the Complete Review.**

        **i.**    **Statistical Sampling is Less Precise.**

Statistical sampling is not an exact science. NICKLESS DEPO 7:2-3, 74:2-5. This is because the results of statistical sampling may show that there was a range of signatures that the

petition could have on it, and the number that is needed by law was within the middle of that range. NICKLESS DEPO 76:11-24. In certain instance (including the petition submitted by the Natural Law Party in 1996), the Secretary's office has no choice but to inform the applicant that, despite their best efforts to verify a petition through statistical sampling, the results are inconclusive. NICKLESS DEPO 62:12-15. For this reason, the Election Code requires only ninety-five percent (95%) accuracy when statistical sampling is employed.. NICKLESS DEPO 74:6-8.

### ii. Statistical Sampling Typically Takes Two Months.

With the exception of the petition submitted by Ross Perot in 1992, review of prior ballot-access petitions has generally taken two months, even when statistical sampling is employed. NICKLESS DEPO 98:13-20, 103:6-9. Verification of the 1992 Perot petition required only three weeks. NICKLESS DEPO 22:8-13, 25:7-12. However, this was the exception that proves the rule. NICKLESS DEPO 98:16-17.

### D.   Plaintiffs Can Not Meet Their Burden on Their State Law Claims.

The focus of Plaintiffs' pendent state law claims differs from their federal claims. Specifically, Plaintiffs do not by their state law claims directly challenge the Secretary's decision to perform the complete manual review instead of statistical sampling. Rather, they assert that the Texas Supreme Court's decision in *Francis* requires the Secretary to accept petition signatures on a rolling basis. *Francis* requires no such thing. Rather, Francis is distinguishable on a number of bases.

In *In Re Francis*, --- S.W.3d ----, 2006 WL 197976 (Tex. 2006), a divided Texas Supreme Court considered whether or not the Election Code provided a reasonable opportunity for a ballot-access applicant to cure certain facial defects in signature petitions submitted to a party chair. In that case, the defect at issue (omission of the words "Place 8" in reference to the

Court of Criminal Appeals position for which the applicant sought election) was a purely technical one evident on the face of the defective petitions. The court found that the Election Code provided the opportunity to rectify this minor clerical error. In doing so, however, the court noted the very limited nature of its holding:

> [W]e emphasize several limitations on today's holding. First, it concerns **only facial defects that are apparent from the four corners of a candidate's filings**; it does not reach forgery, fraud, or other non-accidental defects discoverable only by independent investigation. Second, it **concerns only early filings** that allow time for corrections after the **state chair's review**; no additional time will be available for candidates who file at the last minute so that review cannot be completed before the filing deadline. Third, it does not allow political parties or candidates to ignore statutory deadlines; it allows candidates only the time that the Election Code was designed to give them. Fourth, **it concerns only defective filings that have erroneously been approved**; it does not change what the Election Code says **party chairs** should and must reject. Finally, it does not absolve candidates of the need for diligence and responsibility in their filings; party chairs must only notify them of defects, not do their work for them.

Id. at *6 (emphasis added).

        1.    *Francis* **is Limited to Clerical Errors.**

The *Francis* decision states that it is limited to "facial defects that are apparent from the four corners of a candidate's filings." By contrast, the potential defects that the Strayhorn campaign are concerned about are substantive ones (e.g. voter not registered, signed another petition or voted in a primary). Such defects are not "apparent from the four corners of a candidate's filings." *Francis* did not purport to engraft a far-reaching substantive supplementation requirement onto the Election Code.

        i.    **The Texas Legislature Knew How to Allow Substantive Supplementation When it Wanted.**

Plaintiffs cannot argue that the need for supplementation was never considered by the Texas Legislature. Rather, in the context of certain petitions other than indepedent canidate

petitions, the Legislature has permitted a limited supplementation supplementation procedure as follows:

> (a) Except as provided by Subsection (b), a petition may not be supplemented, modified, or amended on or after the date it is received by the authority with whom it is required to be filed unless expressly authorized by law.
>
> (b) If a petition is required to be filed by a specified deadline, the petitioner may file one supplementary petition by that deadline if the original petition contains a number of signatures that exceeds the required minimum number by 10 percent or more and is received by the authority with whom it is required to be filed not later than the 10th day before the date of the deadline. The authority shall notify the petitioner as to the sufficiency of the petition not later than the fifth regular business day after the date of its receipt.

ELECTION CODE § 277.0023.

### ii. There Is No Evidence That the Secretary's Office Will Refuse to Make Reasonable Accommodation for Any Clerical Errors in Strayhorn's Petition.

The *Francis* decision is really nothing new for the Secretary's office. As Melinda Nickless testified, there has been a consistent line of prior cases recognizing that the Secretary's office needs to exercise some discretion when confronted with minor facial errors on petitions (such as lack of a ZIP code):

> Q. So you're looking for obvious errors from -- that, and I can then check quickly. For example, missing names. What sort of things are you looking for?
>
> A. If -- if you only did print your name and sign your name and we didn't have any more information about you, the possibility that we could verify that you're a registered voter is pretty small. And we have -- we look at -- as the years have changed, we look at signatures differently due to the way courts have interpreted the law. Years back when we would look at a signature and if it did not have the state or a ZIP code, it was a bad signature because the statute required that. And so different elements of the petition -- the statute said you have to have this, this, this, and this, and it didn't have that, that, that, and that, we disqualified that signature. And then the courts continually said, "Well, having that ZIP code, does that really tell you anything about that person?" You know, so we started reviewing them, you know, on -- using different levels of requirements or –
>
> Q. But those are the kind of things you're looking for?

> A. So -- but those were the -- we look for every single little element that the statute listed that every signer had to have. And if it didn't, we rejected those signatures. And that's when we did a facial validity.

NICKLESS DEPO 51:7-52:7. Plaintiffs have not demonstrated that the Secretary's office will refuse to apply a similarly flexible approach to its review of Strayhorn's petition.

### iii. While She Is Waiting to Submit Her Signatures, Strayhorn Can Check for Clerical Errors.

Because facial errors are, by definition, discernible by visual inspection of the petition pages, Strayhorn can take the opportunity to carefully review these pages while she is waiting to submit her application.

### 2. *Francis* is Limited to Early Filings.

*Francis* is by its plain language limited to applications filed in advance of the applicable deadline. Here, by contrast, Strayhorn has not yet filed her application (despite her attorney's prior representation to the Court that she would do so the week of April 10) and may not file prior to the deadline (May 11).

### 3. *Francis* is Limited to Filings that Have Already Been Approved.

In *Francis*, the state party chair had already approved the application and petition prior to a legal challenge by another candidate. In this case, by contrast, the Secretary's office has not yet issued any form of approval or certification to Strayhorn (or any other potential independent candidate).

## E. Plaintiffs State Claims Are Subject to Dismissal Pursuant to the Secretary's Eleventh Amendment Immunity.

To the extent that Plaintiffs are attempting to assert purely state-law claims, this Court lacks jurisdiction to entertain them in light of the Supreme Court's holding in *Pennhurst State*

*School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984)("[w]e conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law").

## CONCLUSION

WHEREFORE, Defendants request that this Court enter final judgment denying Plaintiffs any and all relief demanded in the Complaint, dismissing all of Plaintiffs' claims with prejudice, ordering that Plaintiffs take nothing by this suit and granting Defendant costs and attorneys fees, and such other and further relief to which Defendant may show himself justly entitled.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

_____
EDWARD D. BURBACH
Deputy Attorney General for Litigation
Texas State Bar No. 03355250
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1886; (512) 936-0545 FAX
ed.burbach@oag.state.tx.us

Attorney-in-Charge

DAVID S. MORALES
Associate Deputy Attorney General for Litigation
Texas State Bar No. 00792065

KATHLYN C. WILSON
Texas State Bar No. 21702630
Assistant Attorney General
General Litigation Division

RICHARD E. SALISBURY
Texas State Bar No. 24033034
Assistant Attorney General
General Litigation Division

***ATTORNEYS FOR DEFENDANT***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via electronic means and/or First Class United States Mail, on April 27, 2006 to:

Randall Buck Wood
Ray, Wood & Bonilla LLP.
2700 Bee Caves Road, Suite 200
Austin, Texas 78746
**Attorney for Plaintiffs**

_____
EDWARD D. BURBACH
Deputy Attorney General for Litigation