FILED

MAY - 1 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
       DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| CAROLE KEETON STRAYHORN, KIMBLE D. ROSS, DAVID MAYES MIDDLETON II, BARBARA RUUD,<br>§ § § § *Plaintiffs*, § § v. § § ROGER WILLIAMS, IN HIS OFFICIAL CAPACITY § AS TEXAS SECRETARY OF STATE, § *Defendant*. § | Civil Action No.<br><br>A06 CA 205-LY |

### DEFENDANT'S RESPONSE TO PLAINTIFFS' TRIAL BRIEF

TO THE HONORABLE UNITED STATES DISTRICT JUDGE LEE YEAKEL

COMES NOW Defendant Roger Williams, in his official capacity as Texas Secretary of State (the "Secretary"), and files this response to Plaintiffs' Trial Brief ("Plaintiffs' Brief").

1. On Thursday, April 27, 2006, Plaintiffs' counsel contacted the undersigned by telephone to advise that Plaintiffs would be abandoning all of their state court claims, including their reliance upon the recent Texas Supreme Court *Francis* decision. Although Plaintiffs have not amended their Complaint, it appears from the content of Plaintiffs' Trial Brief that they have indeed abandoned all of their state law claims herein.[1] Plaintiffs do not challenge the constitutionality of any applicable law. Therefore, Plaintiffs' only remaining claims are alleged "as applied" violations of their right to political association under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs have not and can not meet their burden to establish that the Secretary has violated these rights.

2. Plaintiffs' requested relief appears to also be evolving. Plaintiffs apparently now agree that the Secretary's method of checking every signature for his review and certification is

---

[1] Defendant already addressed Plaintiffs' state law arguments in its Trial Brief.

completely legal. Instead, Plaintiffs' now apparently request that the Secretary <u>also</u> undertake statistical sampling as a service to the campaign and as a "simple check on the final results".

> It is permissive and there is nothing in the Election Code that would prevent the Secretary from doing a statistical sample and then not relying on it for certification purposes...it would seem prudent to do a statistical sample in order to estimate the number of valid petition signatures the Secretary should find as a simple check on the final results. Plaintiffs find nothing in the Election Code that would prohibit the Secretary from performing such a check and making the results known to the prospective candidates.

*See* Plaintiffs' Trial Brief at 11-12. The Secretary is not empowered to provide such a service to the campaign. Furthermore, such an informal sampling would require additional time and expense and would actually undermine the formal review. For example, the proposed sampling at 95% accuracy would necessarily come up with different numbers of proper signatures than the results of the more accurate formal review of each signature. This is of concern in light of the Strayhorn campaign's intention to file suit should the Secretary determine that it has not submitted sufficient signatures regardless of whether the signatures are reviewed by statistical sampling or by checking every signature. SANDERS DEPO 82:6-83:7. As testified to by Plaintiffs' expert Dr. Jerome Olson, Strayhorn can easily check the validity of her own signatures. *See* Olson depo generally, OLSON DEPO 25:19-27:13. Not providing such an informal sample certainly does not constitute a violation of Plaintiffs' constitutional rights by the Secretary.

    3.    The Secretary continues to rely upon all of the arguments in his Trial Brief and will not recapitulate that brief verbatim. Instead, the Secretary takes this opportunity to respond to

correct certain specific factual allegations in Plaintiffs' Brief and errors in law argued in Defendant's Trial Brief.[2]

*The Secretary Does Not Have a "Policy" Prohibiting Supplementation.*

4. Plaintiffs assert that the Secretary has a "policy prohibiting the supplementation of applications." *See* Plaintiffs' Brief p. 1. This is not the case. To be entitled to a place on the general election ballot as an independent candidate for governor, Strayhorn must not later than 5:00 p.m., May 11, 2006 file with the Secretary an application for a place on the ballot complying with Texas Election Code §141.031 <u>accompanied by</u> a petition containing 45,540[3] valid signatures of voters registered in Texas meeting the requirements of the Texas Election Code ("the Application"). Texas Election Code §§ 142.004, 142.005, 141.062. The petition is considered part of the Application. Texas Election Code § 141.032 (c). There is no provision in the Election Code that allows the Secretary to accept "supplementation of applications". *See* Defendant's Trial Brief at p. 5-7. There is also no provision that would allow the Secretary to accept any Application after the May 11 deadline. Plaintiffs wish for the Secretary to act as a legislature and create such a law. The Secretary properly declines to do so.

*Plaintiffs Submit No Evidence of Harm.*

5. As set forth in Defendant's Trial Brief, Plaintiffs have failed to establish evidence of harm that they may suffer as a result of the Secretary's decision to utilize changes in the law and

---

[2] The Secretary also corrects an inadvertent error in Defendant's Trial Brief. The second sentence on page 11 should read "The team consisted of Ms. Nickless, Mary Jackson, and the Secretary of State's IT Director, Scott Brandt." In error, the brief referred to Ms. McGeehan rather than Ms. Jackson.

[3] One percent of the total vote received by all candidates for governor in the most recent gubernatorial general election. Texas Election Code § 142.007(a). *See also* Plaintiffs' Original Complaint at 2:7.

technology to review every signature on petitions submitted by candidates as part of their Applications.[4] In fact, Plaintiffs don't even assert that Plaintiff Strayhorn will have difficulty submitting sufficient petitions with her Application to be certified on the ballot. On the contrary, Strayhorn Campaign Press Secretary/Political Advisor Mark Sanders testified on April 25, 2006 that he is "intimately familiar" with "all aspects" of her collection of petition signatures. SANDERS DEPO 53:23-54:12. He testified that she already had more than enough petition signatures to be placed on the ballot. SANDERS DEPO 53:23-56:19, 76:14-79:15. He specifically testified that the campaign has already collected "tens of thousands of signatures" and that Strayhorn has made a strategic decision to not yet submit her Application and petitions but, instead, wants to submit enough signatures to qualify even if 40% of the signatures are invalid. *Id.* Sanders testified that he does not know if Strayhorn has sufficient signatures to provide for this cushion. *Id.*

*Plaintiffs Ross, Middleton, and Ruud Have Not and Will Not Suffer Any Harm.*

6. Plaintiffs utterly fail to set forth any harm at all suffered by Plaintiffs Ross, Middleton, and Ruud. That is because they have not and will suffer no harm. Plaintiffs Ross, Middleton and Ruud allege that they are each a "resident of the State of Texas, a registered voter in Texas, and a person who desires to vote for and campaign for the election of Strayhorn as governor." *See* Plaintiffs' Original Complaint at 1-2:2-4. None of these Plaintiffs was able to identify anything that he or she was not able to do because of the Secretary's decision to check every signature. Perhaps the best evidence of lack of harm is the manner in which these Plaintiffs became Plaintiffs in this lawsuit. None of them sought out counsel to assert claims. On the contrary, these Plaintiffs

---

[4]Plaintiffs' Trial Brief describes this review as a "manual count". Plaintiffs' Brief p. 2. As thoroughly set forth in Defendant's Trial brief, the electronic review process is far from a "manual" count. *See* Defendant's Trial Brief at p. 7-12.

were solicited by the Strayhorn campaign. ROSS DEPO 39:23-41:21 (contacted by Strayhorn Campaign Press Secretary/Political Advisor Mark Sanders); MIDDLETON DEPO 6:13-10:20 (contacted by Strayhorn Campaign Manager Bradley McClelland and assistant Michael Rigg); RUUD DEPO 6:3-7:1, 17:4-18:2 (contacted by Strayhorn Campaign Manager Bradley McClelland and assistant Michael Rigg). None of these Plaintiffs even saw their Complaint (much less had any input into the claims) before it was filed. *Id.* In fact, these Plaintiffs were only shown their Complaint to prepare for their depositions. *Id.* Each of these Plaintiffs has testified that they have been or will be able to sign Strayhorn's petition, volunteer for, contribute to, campaign for, and/or solicit signatures for Strayhorn. ROSS DEPO 37:10-39:19; MIDDLETON DEPO 7:5-9:18; RUUD DEPO 18:3-20:19, 33:25-34:16. Plaintiff Ross admitted that he is not precluded from doing anything. ROSS DEPO 98:16-100:5. Similarly, Plaintiffs (and their witnesses) identified absolutely no one that has or will be unable to sign Strayhorn's petition, volunteer for, contribute to, campaign for, and/or solicit signatures for Strayhorn.

*Plaintiff Strayhorn Has Not and Will Not Suffer Any Harm.*

7.   Plaintiffs' Trial Brief cites the testimony of McClung, Ross, and Sanders to establish harm. *See* Plaintiffs' Trial Brief at p. 2-3. However, this testimony does not establish harm.

8.   Plaintiffs' Trial Brief cites the testimony of "fact witness" Mark McClung for the proposition that "In short...having to wait until July [2006] to start a campaign would put any statewide candidate at an extreme disadvantage". *Id.* However, Ms. Strayhorn did not start her campaign in July 2006. In fact, she announced her candidacy for governor more than one year earlier in June *2005*. SANDERS DEPO 49:16-21. She announced as an independent candidate on January 2, 2006.

9.  Interestingly, although he was designated as a "fact witness", Mr. McClung knows very little about the Texas race for governor and the Strayhorn campaign. *See* Defendant's Trial Brief at p. 18-19. Plaintiffs argue that his testimony is that television "stations will not sell [ad time] to a candidate that does not have some indication that she has qualified for the ballot". However, McClung admitted that he based this testimony not upon any facts involved in the Strayhorn campaign (and this lawsuit) but solely upon "his experience". MCCLUNG DEPO 36:21 -37:4. In fact, Sanders acknowledged that Strayhorn has not yet attempted to purchase any advertising and would not have done so even if she were guaranteed favorable rates. SANDERS DEPO 80:11-81:5. In fact, Sanders is unaware that any candidate (including Perry) has purchased any television advertising to date for the general election. SANDERS DEPO 81:7-12. Mr. Sanders admitted that this alleged difficulty in purchasing television ad time "has not been an issue because we're not buying any TV at this point in time" and will not even start talking to television stations about buying ad time until July 2006. SANDERS DEPO 80:2-81:12, 88:2-89:4. This is in accord with Mr. McClung's testimony that Strayhorn and Democratic candidate Bell will be depending heavily upon small donors who become interested in and donate money late in the campaign. MCCLUNG DEPO 48:3 -50:24.

10. Strayhorn's complaint is actually her perception regarding her ability to get *free* press coverage (according to Sanders also referred to by Republicans as "free media"). SANDERS DEPO 65:6-68:13. Specifically Sanders testified:

> Q: Okay. And where you've not been satisfied, what specifically have you been dissatisfied with?
> A: Frustration with the media's intent on covering the process of this petition drive as opposed to the substance of what she's campaigning for.
> Q: I mean, is it your testimony that they haven't covered the substance at all?

> A: No, that's not my testimony. It's just frustrating that it is not more coverage of her campaign and issues that she would like to discuss and more coverage of the process itself.

SANDERS DEPO 75:12-22. On the contrary, McClung testified that Strayhorn gets a lot of free media attention, including 4 separate incidences of "free media" in major Texas newspapers (the Houston Chronicle, Dallas Morning News, San Antonio Express News, and the Austin American Statesman) the very day of his deposition alone. MCCLUNG DEPO 26:20 -30:17. Sanders' "frustration" about a perceived lack of "free media" coverage of Strayhorn's campaign has nothing to do with the Secretary. Instead, it has everything to do with the fact that she chose to drop out of the Republican primary, run for governor as an independent, and make a decision to wait to file her Application. These decisions were certainly her prerogative. However, Sanders' "frustration" does not rise to the level of a violation of Plaintiffs' constitutional rights by the Secretary.

11. Plaintiffs also allege that Sanders has "found that potential donors who have indicated a willingness to contribute nevertheless are holding off until they are satisfied that she will actually be on the ballot". *See* Plaintiffs' Trial Brief at 2 citing Sanders deposition at 68-72. However, Sanders could not identify any such person or quantity of money. SANDERS DEPO 69:7-70:16. In fact, Sanders acknowledged that Strayhorn already had $8.1 million of cash on hand as of January 2006. SANDERS DEPO 69:17-22. Among all the gubernatorial candidates she ranks a close second to incumbent Rick Perry's $9 million. SANDERS DEPO 69:23-70:16. Strayhorn had more than *sixty-two times* as much cash on hand as Democratic candidate Chris Bell ($130,000). SANDERS DEPO 69:7-70:16. Sanders testified that Strayhorn has been raising funds at a "very healthy rate". *Id.* Plaintiffs allege that Plaintiff Ross testified that "he has been frustrated in his individual efforts to raise money for the Strayhorn campaign because there is not yet any indication that she will actually be on the ballot." *See* Plaintiffs' Trial Brief at 2 citing Ross deposition at 99. However, Ross did

not identify anyone that told him that they would not contribute to Strayhorn's campaign and testified that he is not precluded from fund-raising or any other activity in support of Strayhorn. Supra 3-4; ROSS DEPO 99:7-100:2. His "frustration" emanates from the "Let's wait and see" situation. ROSS DEPO 99:7-100:2. Of course, this is the result of Strayhorn's conscious decision to not turn in her Application.

*The Method Is Not a "Manual" or an Entirely "New" Process.*

12.    Plaintiffs refer to the process by which the Secretary will be reviewing Applications and petition signatures as a "manual review". On the contrary, as thoroughly set forth in Defendant's Trial Brief, the process is not "manual". Plaintiffs suggest that merely because reviewing every signature has not previously been employed in review of ballot-access petitions exceeding 1,000 signatures, it is necessarily a "new process." PLAINTIFFS' BRIEF at p. 3. It is not. In fact, Plaintiffs acknowledge that the a review of every signature *has* been used for review of petitions with fewer than 1,000 signatures.

13.    Plaintiffs also imply that the Secretary's process is "new" merely because the Secretary's office has outsourced data-enty to TELA Technologies. However, TELA Technologies is doing nothing more than entering data from the petitions into an Oracle database. MCGEEHAN DEPO 6:12-18. The Secretary's office has used the Oracle database for years. MCGEEHAN DEPO 6:19-21. The cross-checking of petition signatures will be accomplished with what are known as "queries" to the database. MCGEEHAN DEPO 6:22-7:5. The Secretary's IT Department expects to perform these database queries without any difficulty. MCGEEHAN DEPO 7:6-10. This confidence is warranted in light of the fact that the query process is very similar to the duplicate voter record queries that the IT Department is already performing. MCGEEHAN DEPO 8:13-18.

*The Record Evidence Simply Does Not Support Plaintiffs' Assertions Regarding the Speed of Statistical Sampling.*

14. Plaintiffs assert that "the available evidence shows that it will **certainly** take less time to perform a statistical sample than to look at each and every signature." PLAINTIFFS' BRIEF at p. 3 (emphasis added). This is simply untrue. Rather, the general rule has been that petition verification takes two months, even when statistical sampling is employed. NICKLESS DEPO 98:13-20, 103:6-9. It is true that the certification of the 1992 Perot Application took almost four weeks. However, Perot's 1992 Application was an "anomoly". NICKLESS DEPO 54:5-13. Unlike the situation at issue here, in 1992 Perot was the only independent candidate for a major political office seeking certification on the general election ballot. Therefore, only his petitions needed to be reviewed. Although he was required to submit 54,275 petition signatures, he filed an Application with over 220,000 petition signatures; that is, *more than 4 times the required amount*. NICKLESS DEPO 9:23-10:4, 20:19-22. As a result, the statistical sampling methodology required that only 108 signatures had to be verified.[5] In addition, his petitions were very well organized and labeled – a situation described as an "anomaly." NICKLESS DEPO 54:5-13.

15. Defendant has already discussed the fallacy of Plaintiffs' remaining factual arguments in Plaintiffs' Trial Brief and will not repeat same herein.

*Plaintiffs' Party-Designation Cases Are Inapposite.*

16. Plaintiffs cite three cases considering the constitutionality of various state statutes prohibiting minor-party designations on voter registration forms (*Baer v. Meyer*, 728 F.2d 471 (10th

---

[5] The number of samples needed to be checked is inversely related to the number of petition signatures submitted. That is, the more signatures submitted, the less samples that need to be checked.

DEFENDANT'S RESPONSE TO PLAINTIFFS' TRIAL BRIEF                                                                                 Page 9

Cir. 1984)) and election ballots (*Dart v. Brown*, 717 F.2d 1491 (5th Cir. 1983) and *Rosen v. Brown*, 970 F.2d 169 (6th Cir. 1992)). These cases are distinguishable on a number of grounds. Most notably, these cases all involved a *facial* challenge to state election statutes. Here, by contrast, Plaintiffs do not mount a facial challenge to any portion of the TEXAS ELECTION CODE. By failing to do so, they acknowledge the constitutionality thereof, including the 55-day deadline in § 142.010. Plaintiffs fail to allege that the Secretary is unwilling or unable to comply with any of these statutes.

*Carter-Mondale Reelection Committee, Inc. v. Federal Election Commission, 642 F.2d 538 (D.C. Cir. 1980) Is Also Inapposite.*

17.   Plaintiffs attempt to equate the challenged action in *Carter-Mondale* – the withholding of federal campaign matching funds – with the speculative fundraising difficulties that the Strayhorn campaign may theoretically suffer in the future. This effort fails, for at least two reasons. First, as Plaintiffs acknowledge, "the Secretary does not hold Strayhorn's actual campaign funds." PLAINTIFFS' BRIEF at p. 9. Second, in *Carter-Mondale Reelection Committee, Inc.* the Federal Election Commission had already determined that the competing campaign (Reagan-Bush) was eligible for federal matching funds. Here, by contrast, the Secretary has not made any sort of eligibility determination with respect to Strayhorn's application (which she has yet to submit).

WHEREFORE, for the foregoing reasons and the reasons discussed in his previously-submitted trial brief, Defendant requests that this Court enter final judgment denying Plaintiffs any and all relief demanded in the Complaint, dismissing all of Plaintiffs' claims with prejudice, ordering that Plaintiffs take nothing by this suit and granting Defendant costs and attorneys fees, and such other and further relief to which Defendant may show himself justly entitled.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

_____
EDWARD D. BURBACH
Deputy Attorney General for Litigation
Texas State Bar No. 03355250
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1886; (512) 936-0545 FAX
ed.burbach@oag.state.tx.us

Attorney-in-Charge

DAVID S. MORALES
Associate Deputy Attorney General for Litigation
Texas State Bar No. 00792065

KATHLYN C. WILSON
Texas State Bar No. 21702630
Assistant Attorney General
General Litigation Division

RICHARD E. SALISBURY
Texas State Bar No. 24033034
Assistant Attorney General
General Litigation Division

***ATTORNEYS FOR DEFENDANT***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via electronic means, hand delivery, and/or First Class United States Mail, on May 1, 2006 to:

Randall Buck Wood
Ray, Wood & Bonilla LLP.
2700 Bee Caves Road, Suite 200
Austin, Texas 78746
**Attorney for Plaintiffs**

_____
EDWARD D. BURBACH
Deputy Attorney General for Litigation